IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


LINDA WHITNEY,                          )        CASE NO. 3:13-cv-01407
*Substituted for Plaintiff*             )
*Deceased*                              )
Michelle Ann Whitney                    )
                    Plaintiff,          )        MAGISTRATE JUDGE
                                        )        KATHLEEN B. BURKE
          v.                            )
                                        )
COMMISSIONER OF SOCIAL                  )
SECURITY ADMINISTRATION,                )
                                        )        **MEMORANDUM OPINION & ORDER**
                    Defendant.          )


Plaintiff Michelle Ann Whitney ("Plaintiff" or "Whitney")[1] seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 15.  As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Whitney protectively filed[2] applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on April 25, 2010.[3]  Tr. 10, 68-71.  She alleged a

---

[1] On July 15, 2014, Linda Whitney was substituted for Deceased Plaintiff Michelle Ann Whitney.  No cause of
death was indicated in the Notice of Suggestion of Death (Doc. 18) or Motion for Substitution (Doc. 19).

[2] Protective filing is a Social Security term for the first time you contact the Social Security Administration to file a
claim for disability or retirement. Protective filing dates may allow an individual to have an earlier application date
than the actual signed application date. This is important because protective filing often affects the entitlement date
for disability and retirement beneficiaries along with their dependents.
http://www.ssrc.com/disabilityquestionsmain20.html (Last visited 7/31/2014).

disability onset date of March 24, 2009 (Tr. 120, 122) and claimed disability due to sleep apnea, congenital bronchiectasis, ulcerative colitis, iron deficiency anemia, emphysema, Mounier-Kuhn syndrome,[4] anxiety, depression, acid reflux and migraines (Tr. 73, 76, 138). After initial denial by the state agency (Tr. 73-78), and denial upon reconsideration (Tr. 81-85), Whitney requested a hearing (Tr. 88). On January 9, 2012, Administrative Law Judge Paul Reams ("ALJ") conducted an administrative hearing. Tr. 25-67.

In his February 9, 2012, (Tr. 7-24), the ALJ determined that Whitney had not been under a disability from March 24, 2009, though the date of the decision. Tr. 10-19. Whitney requested review of the ALJ's decision by the Appeals Council. Tr. 6. On May 28, 2013, the Appeals Council denied Whitney's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

### A.      Personal, educational and vocational[5] evidence

Whitney was born in 1988. Tr. 31, 120, 122. At the time of the hearing, she was 23 years old. Tr. 32. She was not married and did not have any dependents. Tr. 32. She resided with her mother. Tr. 32-33. She completed high school and took some college courses online. Tr. 33.

---

[3] The record also reflects filing dates on April 28, 2010 (Tr. 120-121) and April 29, 2010 (Tr. 122-125). The ALJ concluded that Whitney protectively filed her applications on April 25, 2010. Tr. 10. This filing date is supported by the record (Tr. 68-71) and not challenged by Whitney.

[4] Mounier-Kuhn syndrome, also known as tracheobronchomegaly, is a "great enlargement of the lumen of the trachea and the larger bronchi, a rare, usually congenital condition." *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at pp. 1201, 1971.

[5] During the administrative hearing, Whitney provided testimony regarding her past work. Tr. 34-35, 55-58. Whitney also provided information regarding her past work during the application process. Tr. 140 (Disability Report), Tr. 164 (Report of Contact).

Whitney last attempted to work part-time from May 2010 through October 2010 at a Holiday Inn Express cleaning rooms.[6]  Tr. 34-35, 55.   In 2008, she worked for Citigroup doing bill collecting over the telephone.  Tr. 57.  She worked at a call center.  Tr. 57-58.  She had to take a medical leave of absence shortly after starting.  Tr. 57-58.  She indicated that she ended up having to quit; Citigroup told her to come back if she got better.  Tr. 58.  In 2007, she worked a customer service job at a telephone call center answering telephones and trying to troubleshoot problems.  Tr. 56.  She worked full-time at the customer service job but stated that she had problems doing the work because she had to take breaks more frequently than the scheduled breaks and she worked near people who smoked.  Tr. 57.  Also, if she had a coughing spell while on the telephone, someone would have to take over the call for her.  Tr. 57.

**B.     Medical evidence**

**1.   Treatment history[7]**

On January 21, 2010, Whitney was admitted to the University of New Mexico Hospital for complaints of shortness of breath, which she reported had become progressively worse over the prior week.  Tr. 1211, 1405, 1411.  She also reported having increased nausea and vomiting over the prior few days.  Tr. 1211, 1405.  Whitney was not taking any medication.  Tr. 1212.  Her lung examination revealed coarse breath sounds consistent with rhonchi; her upper fields were clear to auscultation bilaterally; and there was no wheezing or crackling.  Tr. 1213, 1408.

---

[6] Based on information in a Disability Report, Whitney also worked as a housekeeper in a hotel from June 2005 through June 2006.  Tr. 140.  She also worked as a night manager in a pizza restaurant in 2005 for about one year. Tr. 58, 140, 164.

[7] Whitney's medical records are extensive, there being approximately 1,800 pages of medical records (Tr. 213-2070) and treatment through various medical providers, including Toledo Hospital, Toledo E.N.T., Inc., Children's Hospital, Saint Alphonsus, Defiance Regional Medical Center, University of New Mexico Hospital, Presbyterian Hospital, Robert E. Barnett, M.D., and Dr. Shelly Mills, D.O. (Doc. 16, pp. 3-4 referring to the various medical providers that Whitney has received treatment from or through).  Those records are not summarized in their entirety herein.

A January 22, 2010, chest x-ray showed marked dilatation of and irregular tracheal contour consistent with a history of Munier-Kuhn disease; bronchial obstruction of the left lower lobe bronchus with extensive distal emphysema suggesting a chronic process; pneumonia in both lower lobes; and possible intraluminal mass of her upper esophagus. Tr. 1470-1471. During her admission she was transferred to the MICU twice for worsening of respiratory conditions. Tr. 1239, 1258-1261, 1263-1264, 1417.

Whitney remained in the hospital through January 29, 2010. Tr. 1416. Her discharge diagnoses included Mounier-Kuhn syndrome; bronchiectasis secondary to Mounier-Kuhn syndrome; right middle lobe lobectomy secondary to bronchiectasis; obstructive sleep apnea (resolved); gastroesophageal reflux disease; ulcerative colitis (currently stable); anemia, iron deficiency; reactive airway disease/asthma; hospital acquired pneumonia; increased oxygen demand requiring home oxygen; hypovitaminosis D; leukocytosis; thrombocytosis; and sepsis. Tr. 1418. Her condition on discharge was fair and her functional capacity was limited with the expectation that Whitney would make full recovery since she had been active walking her pets and previously had no limitations at home. Tr. 1417-1418. Whitney was advised to follow up with various specialists and establish relationships with medical providers so that her overall health could be monitored and further hospitalization avoided. Tr. 1419. Whitney's discharge summary indicates that, considering Whitney's health conditions, it was odd that she had not been taking medications prior to her admission. Tr. 1419.

On May 20, 2010, Whitney presented to the Defiance Regional emergency room with complaints of blood in her stool. Tr. 1511-1521. She reported a history of ulcerative colitis.[8]

---

[8] Earlier treatment records reflect treatment for ulcerative colitis. *See* e.g., Tr. 1899-1900.

Tr. 1511. Whitney reported that, because of a recent move and insurance changes,[9] she had not been taking her ulcerative colitis medication. Tr. 1511. Whitney's lungs were clear to auscultation bilaterally with no wheezing, rhonchi or rales. Tr. 1511-1512. Her abdomen was soft with normoactive bowel sounds. Tr. 1512. There was mild left suprapubic and left lower quadrant tenderness and no guarding or rebound. Tr. 1512. Whitney was alert and oriented. Tr. 1512. A CT of the abdomen showed severe emphysema and bronchiectasis in the lower lobes and colitis. Tr. 1512, 1515-1518. There was no abscess or acute findings. Tr. 1512. Whitney was diagnosed with colitis and hypokalemia. Tr. 1512. She was discharged home in fair and stable condition with instructions to follow up with her primary care physician and continue with her medications.[10] Tr. 1512.

On August 27, 2010, and October 15, 2010, Whitney was treated by Dr. Robert E. Barnett, M.D., for a cough and congestion and breathing and colon issues. Tr. 1816-1825. In August 2010, Whitney complained of cough/congestion. Tr. 1818. Her lungs were normal except rhonchi heard. Tr. 1818. She was assessed with acute bronchitis and advised to avoid cigarette smoke and limit her activity pending improvement of her symptoms. Tr. 1818-1819. In October 2010, she complained that her ulcerative colitis was acting up. Tr. 1816. Her abdomen was normal except "tender to palpation without guarding without rebound diffuse." Tr. 1816. Her lungs were normal except expiratory wheezes heard. Tr. 1816. Dr. Barnett's plan was to continue current medications at the current dose and follow up in one month. Tr. 1817.

---

[9] Whitney had moved from New Mexico back to Ohio in 2010. Tr. 1783, 1927.

[10] It was noted that Robert E. Barnett, M.D., was Whitney's primary care physician. Tr. 1512.

Whitney first treated with Dr. Shelly K. Mills, D.O., on March 11, 2011.[11] Tr. 1842-1843, 2066. On March 11, 2011, Whitney saw Dr. Mills for a general check-up and to review her medical history. Tr. 1842. Dr. Mills' notes reflect that Whitney's major problems were Mounier-Kuhn syndrome, sleep apnea, immune deficiency, COPD, and bronchiectasis. Tr. 1842. Whitney also had a history of colitis. Tr. 1843. Whitney had multiple specialists for her chronic conditions. Tr. 1842. Dr. Mills' plan included follow up with Whitney's specialists and lab work. Tr. 1843.

A few days later, on March 15, 2011, Whitney was seen for complaints of vomiting and diarrhea.[12] Tr. 1840-1841. On examination, Whitney appeared well nourished and in no distress; her lungs were clear to auscultation and percussion; and her bowel sounds were normal with no tenderness, organomegaly, masses, or hernia. Tr. 1840. She was prescribed medication and advised to follow up with a gastroenterologist if her symptoms did not improve. Tr. 1840-1841.

On March 18, 2011, Whitney was seen by medical providers at Digestive Healthcare for management of her ulcerative colitis.[13] Tr. 1883, 1908. Whitney reported having 10-15 bowel movements each day, with diarrhea and blood. Tr. 1883, 1908. She also had abdominal pain. Tr. 1883, 1908. Following an examination, per the recommendation of Dr. Neil M. Kheterpal, D.O., Whitney was transferred to The Toledo Hospital. Tr. 1885, 1910, 1927-1957. While at The Toledo Hospital, Whitney started to show improvement, with her diarrhea decreasing and her abdominal pain resolving. Tr. 1927. An abdominal and pelvic CT scan was indicative of

---

[11] Whitney cancelled a February 11, 2011, appointment with Dr. Mills. Tr. 1844.

[12] It is unclear whether Whitney saw Dr. Mills on March 15, 2011, but it appears that Dr. Mills signed off on the March 15, 2011, treatment notes. Tr. 1841.

[13] Treatment records reflect that, in February 2011, Whitney was seen by Digestive Healthcare as a new patient for her ulcerative colitis and these records reflect that, at that time, her family doctor was Dr. Robert Barnett. Tr. 1886-1888.

diffuse ulcerative colitis. Tr. 1927, 1951-1952. A chest x-ray showed: "Lungs are clear. Cardiac silhouette and pulmonary vasculature are unremarkable. No focal consolidative airspace disease, pneumothorax, or pleural effusion is appreciated. No free air beneath the diaphragm is noted. The osseous structures are within normal limits for age. Stable scarring left lung base. Impression: No acute process." Tr. 1950. On March 23, 2011, Whitney was discharged home in stable condition and continued on a tapered does of steroids and antibiotics. Tr. 1927-1928. She was advised to follow up with Dr. Kheterpal. Tr. 1928.

On April 12, 2011, upon referral by Dr. Mills, Whitney saw Henry J. Jacob, M.D., of the Pulmonary & Critical Care Specialists. Tr. 1867-1868. Dr. Jacob reported that Whitney had been treated for bronchiectasis for a long time with antibiotics, aerosol treatments, and postural drainage. Tr. 1867. He indicated that Whitney had recently felt much better and her pulmonary condition had stabilized. Tr. 1867. He also indicated that Whitney had asthma with occasional wheezing and shortness of breath that responded to Xopenex aerosol treatment.[14] Tr. 1867. Dr. Jacob indicated that Whitney's only chronic complaint was a cough with expectoration sometimes in the morning. Tr. 1867. Dr. Jacob's recommendations included obtaining a CT chest scan of the chest to re-evaluate the extent of Whitney's bronchiectasis; starting her on Acapella treatment; and seeing her for follow up in a few weeks. Tr. 1867.

On June 2, 2011, Whitney underwent a colonoscopy. Tr. 1856-1858. The colonoscopy findings were consistent with "quiescent chronic inflammatory bowel disease." Tr. 1857. The testing showed no active colitis. Tr. 1857.

On June 21, 2011, Whitney saw Dr. Kheterpal for follow up and laboratory test results. Tr. 1864. Whitney reported intermittent abdominal pain, nausea, and vomiting. Tr. 1866. She

---

[14] Dr. Jacob noted that Whitney also had ulcerative colitis for which she was being treated by Dr. Khetarpal. Tr. 1867.

did not have bloody stools, constipation, diarrhea or rectal bleeding. Tr. 1866. Dr. Kheterpal assessed Whitney as having a mild flare up with her ulcerative colitis and discussed a treatment plan, including starting Whitney on a different prescription, 6 MP – 50 mg. Tr. 1866. On July 20, 2011, Dr. Kheterpal provided Dr. Mills with an update regarding Whitney's ulcerative colitis. Tr. 1862-1863. He indicated that, since starting Whitney on 6MP – 50 mg, Whitney was doing significantly better with respect to her ulcerative colitis. Tr. 1862. Whitney was having on average 3-4 bowel movements each day, which Whitney described as semi-solid, with no blood. Tr. 1862. He reported that Whitney denied abdominal pain. Tr. 1862. Whitney's abdominal examination was "essentially unremarkable." Tr. 1862. Dr. Kheterpal indicated that, "[o]verall, she [Whitney] feels significantly better." Tr. 1862. He indicated that her ulcerative colitis appeared to be in clinical remission. Tr. 1862. For maintenance, Dr. Kheterpal recommended that Whitney have a colonoscopy every 2-3 years and a bone scan annually. Tr. 1862. He also recommended a six month follow up with his office. Tr. 1863.

In September 2011, Whitney saw Dr. Mills twice with complaints of congestion/cough.[15] Tr. 1830-1833. Generally, Whitney appeared well and in no distress. Tr. 1830, 1831. Dr. Mills noted that Whitney's lungs were normal except for wheezing and rhonchi throughout. Tr. 1833. Dr. Mills' diagnoses included acute bronchitis and an asthma flare up. Tr. 1831, 1833. Dr. Mills prescribed various medications and Dr. Mills advised Whitney to avoid cigarettes and to limit her activity pending improvement in her symptoms. Tr. 1831, 1833.

On November 18, 2011, Whitney saw Dr. Beth A. Besaw, M.D., with complaints of sinus/chest congestion, sore throat, and cough. Tr. 1828-1829. Whitney complained of having a

---

[15] Whitney also saw Dr. Mills in July and August 2011 in connection with a broken pinky finger. Tr. 1834-1836. During those visits, Dr. Mills noted that Whitney was well-appearing and in no distress (Tr. 1835) and, her lungs were clear to auscultation and percussion and her bowel sounds were normal with no tenderness. Tr. 1834.

sore throat for two weeks and a cough for one month. Tr. 1828. She indicated that she had felt

better for a few days about a month ago following the use of Prednisone. Tr. 1828. However,

she started having congestion and shortness of breath again. Tr. 1828. Whitney was seeing a

pulmonologist, Dr. Jacob, but was not scheduled to see him until January. Tr. 1828. Dr. Besaw

noted that Whitney appeared ill. Tr. 1829. Her sinuses were tender to palpation. Tr. 1829. Her

lungs were normal except inspiratory wheezes were heard. Tr. 1829. Dr. Besaw diagnosed

Whitney with sinusitis acute unspecified and she prescribed an antibiotic, Prednisone, and

Depomedrol. Tr. 1829. Dr. Besaw advised Whitney to avoid cigarette smoke; use steam

inhalation if helpful; and to follow up if her symptoms worsened in a few days. Tr. 1829.

### 2. Opinion evidence

#### a. Treating sources

<u>Shelly K. Mills, D.O.</u>

On December 20, 2011, Dr. Mills completed a Physical Residual Functional Capacity

Report ("RFC Report"). Tr. 2066-2070. Dr. Mills indicated that she had first seen Whitney on

March 11, 2011. Tr. 2066. She indicated that Whitney's diagnoses included "Mounier-Kuhn

syndrome, sleep apnea, . . . congenital bronchiectasis, ulcerative colitis, . . . depression, anxiety .

. . ." Tr. 2066. Dr. Mills opined that Whitney's prognosis was fair. Tr. 2066. Whitney's

symptoms were chronic diarrhea, chronic shortness of breath, left finger pain, abdominal pain,

rectal pain, nausea, vomiting, and pain. Tr. 2066. Dr. Mills indicated that Whitney's "rectal

abd[ominal] pain [was] due to ulcerative colitis intermittent." Tr. 2066. Whitney's "neck pain

[was] due to depression/anxiety." Tr. 2066. When asked to identify the "clinical findings and

objective signs," Dr. Mills listed "multiple specialty reports" and "wheezing/dyspnea." Tr. 2066.

Dr. Mills did not identify what "specialty reports" she was referring to. Tr. 2066. Dr. Mills also

described medication side-effects that Whitney experienced, which included fatigue as a result of long-term steroids; nausea from Asacol; and fatigue from Paxil.  Tr. 2066.

Dr. Mills opined that, as a result of her impairments, Whitney was functionally limited in a variety of areas, including frequent interference with attention and concentration needed to perform even simple work tasks; limitations in her ability to walk, stand, and sit; the need for unscheduled 10-15 minute breaks; and various lifting/carrying, postural and manipulative limitations.  Tr. 2067-2069.  When asked "to what degree can your patient tolerate work stress," Dr. Mills opined that "moderate stress is okay," indicating that her conclusion was based on the fact that Whitney "is controlled well on meds but has flares."  Tr. 2067.  Dr. Mills also opined that, on average, Whitney would likely be absent from work as a result of her impairments or treatment more than 4 days per month.  Tr. 2070.   When asked to described "any limitations . . . that would affect your patient's ability to work at a regular job on a sustained basis, Dr. Mills stated that "[a]nything that could exacerbate SOB, stress or exposure to infection."  Tr. 2070.

### *Robert E. Barnett, M.D.*

On January 18, 2011, Dr. Barnett completed a medical report wherein he indicated that he had first seen Whitney on August 27, 2010, and last seen her on October 15, 2010.  Tr. 1820-1825.  His diagnoses included ulcerative colitis, COPD, and bronchiectasis.  Tr. 1820.  He listed her medications.  Tr. 1821.  Dr. Barnett indicated that Whitney's symptoms included "severe cough and shortness of breath with episodes" and he indicated that severe bronchiectasis was the pertinent finding on clinical examination.  Tr. 1820.  He also indicated that Whitney had frequent exacerbations of bronchial infection.  Tr. 1821.  Dr. Barnett noted that he did not have consultative or diagnostic testing reports in his file.  Tr. 1820.  He indicated "see pulmonologist and allergist."  Tr. 1820.  When asked to describe any limitations that Whitney's impairments

imposd on her ability to perform sustained work activity, Dr. Barnett stated that Whitney had severe activity restrictions secondary to shortness of breath. Tr. 1821.

### b. Consultative examining psychologist

On July 12, 2010, psychologist Neil S. Shamberg, Ph.D., conducted a consultative evaluation of Whitney. Tr. 1783-1788. He concluded that Whitney had dysthymic disorder. Tr. 1787. He noted that Whitney reported experiencing depression over the past several years, mainly as a result of her various health problems. Tr. 1787. Dr. Shamberg assessed a GAF score of 60.[16] Tr. 1787. With respect to the four work-related mental abilities, Dr. Shamberg opined that Whitney was moderately impaired in her ability to relate to others, including fellow workers and supervisors, and in her ability to withstand the stress and pressure associated with day-to-day work activity; mildly impaired in her ability to understand, remember and follow instructions; and not impaired in her ability to maintain attention, concentration, and pace to perform routine tasks. Tr. 1787-1788. Dr. Shamberg opined that Whitney would benefit from outpatient mental health treatment. Tr. 1788. However, other than her primary care physician prescribing Paxil for her, Dr. Shamberg noted that Whitney was not receiving outpatient mental health treatment nor did it appear that she intended to proceed with such treatment in the near future. Tr. 1784, 1785, 1787-1788.

### c. State agency reviewing physicians/psychologists

On July 21, 2010, state agency reviewing psychologist Karen Steiger, Ph.D., completed a Mental RFC Assessment (Tr. 1790-1793) and a Psychiatric Review Technique (Tr. 1794-1807). In the Psychiatric Review Technique, Dr. Steiger found evidence of dysthymia (Tr. 1797) but

---

[16] GAF Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

concluded that Whitney did not have a listing level impairment (Tr. 1794-1807).   She rated

Whitney has having mild limitations in activities of daily living and social functioning and

moderate limitations in maintaining concentration, persistence or pace.  Tr. 1804.  There were no

episodes of decompensation.  Tr. 1804.  In the Mental RFC Assessment, Dr. Steiger rated

Whitney's ability in 20 categories.  Tr. 1790-1791.  She found Whitney moderately limited in

only two categories[17] and not significantly limited or no evidence of limitation in the remaining

18 categories.  Tr. 1790-1791.  Dr. Steiger indicated that Whitney was taking medication for her

mental health issues but she was not receiving any other psychiatric treatment.  Tr. 1792.  Dr.

Steiger found Whitney's allegations of depression and anxiety supported by the evidence.  Tr.

1792.  She also found that Dr. Shamberg's consultative evaluation was consistent with other

evidence.  Tr. 1792.  Dr. Steiger concluded that Whitney was "capable of learning remembering

and performing work tasks, relating on a superficial basis, concentrating on tasks and adapting to

routine changes.  She would work best in settings without strict time or production demands."

Tr. 1792.

On September 8, 2010, state agency reviewing physician Nick Albert, M.D., completed a

Physical RFC Assessment.  Tr. 1808-1815.  Based on his review of the evidence, Dr. Albert

concluded that, exertionally, Whitney could occasionally lift/carry 20 pounds; frequently

lift/carry 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-

hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and,

other than the lift/carry limits, her ability to push/pull was unlimited.  Tr. 1809.  Dr. Albert also

found that Whitney had non-exertional limitations.  Tr. 1810, 1812.  Whitney could only

---

[17] Dr. Steiger rated Whitney as moderately limited in her: (1) ability to complete a normal workday and workweek
without interruptions from psychologically based symptoms and to perform at a consistent pace without an
unreasonable number and length of rest periods; and (2) ability to interact appropriately with the general public.  Tr.
1790-1791.

occasionally climb ladders/ropes/scaffolds (Tr. 1810) and should avoid concentrated exposure to extreme cold and heat; noise; and fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 1812).

On reconsideration, state agency reviewing physician W. Jerry McCloud, M.D., reviewed the evidence, including Dr. Barnett's October 15, 2010, treatment notes and medical report from 2011. Tr. 1826. Following that review, he affirmed Dr. Albert's RFC Assessment as written. Tr. 1826.

## C. Testimonial evidence

### 1. Plaintiff's testimony

Whitney appeared and testified at the administrative hearing with counsel. Tr. 31-53. She indicated that she was currently receiving most of her medical care through Defiance Hospital. Tr. 40. She sees her family doctor, Dr. Mills, at least once each month and she sees specialists, including a gastroenterologist, every three months and a pulmonologist every six months. Tr. 40.

With respect to her physical impairments, Whitney indicated that she was unable to work due to her breathing problems. Tr. 35-36. She explained that, because of her rare medical condition [Mounier-Kuhn syndrome], her trachea malfunctions which causes her left lung to close off and she gets short of breath. Tr. 36. Such things as the weather, smoking, and dust can make her condition worse. Tr. 36-37. She has sleep apnea. Tr. 37. Also, as a result of her Mounier-Kuhn syndrome, she suffers from congenital bronchiectasis and asthma. Tr. 37-38. She also has emphysema in her right lung. Tr. 38. Whitney also indicated that her ability to work is impacted by her ulcerative colitis. Tr. 37. She experiences flare-ups at least once or twice each month and during a flare-up she has bleeding, diarrhea and vomiting. Tr. 37. She

cannot eat so she gets very tired.  Tr. 37.   She has to be very near a bathroom and the pain is pretty bad.  Tr. 37.  Whitney also indicated that she has acid reflux.  Tr. 38.

She takes Prednisone for her lung problems.  Tr. 42, 51-52.  She has taken Prednisone her entire life.  Tr. 51.  She takes a pill form in the mornings.  Tr. 52.  Side-effects include extra fatigue, water/weight gain, and increased depression.  Tr. 52.  Whitney has used an aerosol nebulizer breathing machine since she was three years old.  Tr. 49-50.  She uses the breathing machine before she goes to sleep and at least once during the day to clear out her lungs.  Tr. 50. If she gets sick and has a flare-up with her lungs, she has to use the breathing machine every four hours when she is at home and she has an emergency inhaler if she is out.  Tr. 50-51.  In the winter, she has a flare-up about once a month and she has a flare-up about once over the summer. Tr. 51.  She also takes another medication, Asacol, which causes her stomach pain and diarrhea. Tr. 42.

With respect to her mental impairments, Whitney indicated that she has been diagnosed with depression and anxiety.  Tr. 38.  When she feels pressure, she breaks down, her breathing becomes even more shallow, she cannot take a deep breath to calm down, and she usually has a coughing fit.  Tr. 38-39.   Whitney stated that she worries unnecessarily and things that someone else would consider easy usually put her on edge.  Tr. 39.  Her depression is controlled pretty well.  Tr. 39.  However, when her depression is at its worst, she does not want to get out of bed and it is hard for her to motivate herself to go to work.  Tr. 39-40.  Dr. Mills treats Whitney for her mental health impairments.  Tr. 40-41.

After walking about two city blocks, Whitney starts to have noticeable shortness of breath and will have to stop for second or so and take a couple of deep breaths before proceeding.  Tr. 42-43.  She has no problems sitting or standing.  Tr. 43.  She can lift about 20 or

30 pounds a few times but she would be unable to frequently carry that amount of weight.  Tr. 43-44.  Because of a broken little left finger,[18] her ability to grasp, pick up little things, and/or type with that hand is limited. Tr. 45.  Whitney indicated that she was told that "it will be two years to go to work with physical therapy."  Tr. 45-46.

At home, she helps with the dishes but she does not do the laundry or vacuum because of lint and dust.  Tr. 46.  Her mother usually does the shopping.  Tr. 46-47.  She does not like walking around the store.  Tr. 47.  Also, she only eats certain things so there is not much for her to shop for at the store.  Tr. 47.  She has a driver's license but rarely drives.  Tr. 47.  During the day, she usually reads for school and listens to music.  Tr. 47-48.  Rather than typing, she texts friends sometimes because she does not have to use her pinky finger to text.  Tr. 48.  She spreads any chores that she has throughout the remainder of her day.  Tr. 48.

She does not smoke.  Tr. 48.  She  used to drink heavily but now only has a drink occasionally.  Tr. 48-49.

### 2. Vocational Expert's testimony

 Vocational Expert ("VE") Charles McBee testified at the administrative hearing.  Tr. 53-54, 59-66, 114-116.  The VE indicated that Whitney's past work included work as (1) a customer service call center person, a SVP 4[19] (semi-skilled), sedentary position; (2) a cleaner, housekeeper, a SVP 2 (unskilled) light position; (3) a billing collection clerk, a SVP 4 (semi-

---

[18] Whitney initially broke her finger after it got shut in a car door and then she broke it again.  Tr. 44-45.  After three months, it still had not healed.  Tr. 44-45.

[19] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.  Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).    Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

skilled), sedentary position;[20] and (4) a night manager, fast food worker, an SVP 2 (unskilled), light position.  Tr. 60.

The ALJ proceeded to ask the VE a series of hypothetical questions.  Tr. 60.  First, the ALJ asked the VE whether an individual limited to light work, with only occasional manipulation with the left hand, who is required to avoid exposure to extreme cold and heat and environmental irritants such as fumes, odors, dusts and gases; and who is limited to work with no production rates or pace work would be able to perform any of Whitney's past jobs.  Tr. 60-61. The VE indicated that the described individual would be unable to perform any of Whitney's past jobs.  Tr. 61.  The VE indicated that the customer call service center and billing or bank card collection positions would not be available because both positions require frequent to constant bilateral fingering and the hypothetical limited the individual to only occasional fine fingering, i.e., fine manipulation, with the left hand.  Tr. 61, 63.  Also, the cleaner, housekeeper and pizza manager positions would not be available because of the exposure to perfumes, dust and odors. Tr. 61-62.

The VE indicated that, considering Whitney's age, education and work experience, there would be other jobs available in the national economy that the individual described in the first hypothetical could perform, including (1) shipping and receiving weigher, a light, SVP 2 job with 1,200 positions available in Ohio and 50,000 nationwide; (2) counter clerk, a light, SVP 2 job, with 1,000 positions available in Ohio and 50,000 nationwide; and (3) usher, a light, SVP 2 job with 1,000 positions available in Ohio and 50,000 nationwide.  Tr. 62.

The ALJ then asked the VE to assume an individual as described in the first hypothetical except that the individual would be limited to sedentary rather than light work and asked the VE

---

[20] The VE provided Dictionary of Occupational Title (DOT) codes for the positions.  He also submitted a Past Relevant Work Summary dated November 9, 2011.  Tr. 207.  During the hearing, the VE indicated that the DOT code for billing collection clerk was changed from what he had submitted in the record.  Tr. 60, 207.

whether there would be other jobs available that the described individual could perform. Tr. 63. The VE indicated that there would be jobs available,[21] including (1) call-out operator, sedentary, SVP 2 job with 800 positions available in Ohio and 17,000 nationwide; (2) hand mounter, sedentary, SVP 2 job with 500 positions available in Ohio and 20,000 nationwide; and (3) escort vehicle driver, sedentary, SVP 2 job with 1,000 positions available in Ohio and 25,000 nationwide. Tr. 63-64. The VE indicated that, if the described individual at the sedentary level would also miss work four times per month because of impairments or was off task 30% of the time, there would be no jobs available. Tr. 64-65. In response to Whitney's counsel's follow up question, the VE testified that generally employers require their employees to be on task for at least 80% of the workday. Tr. 65.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[22] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[21] The VE noted that fine fingering is generally part of sedentary work. Tr. 63. However, he indicated that there are jobs at the sedentary level where fine fingering would be at an occasional level but with the occupational base severely reduced. Tr. 63.

[22] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[23] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[24] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 19)97). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

---

[23] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[24] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his February 9, 2012, decision, the ALJ made the following findings:[25]

1.  Whitney met the insured status requirements through June 20, 2015. Tr. 12.

2.  Whitney has not engaged in substantial gainful activity since March 24, 2009, the alleged onset date. Tr. 12.

3.  Whitney has the following severe impairments: Mounier-Kuhn syndrome; sleep apnea; colitis; obesity; depression; and anxiety.[26] Tr. 12-13.

4.  Whitney does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. Tr. 13-15.

5.  Whitney has the RFC to perform light work except she must avoid extreme temperatures of cold or heat; and pulmonary irritants such as fumes, odors, dusts, gases, poorly ventilated areas, and chemicals; with no fast paced production requirements. Tr. 16-19.

6.  Whitney is capable of performing her past relevant work as call center person and a billing collection clerk. Tr. 19. The past relevant work does not require the performance of work related activities precluded by Whitney's RFC. Tr. 19.

Based on the foregoing, the ALJ determined that Whitney had not been under a disability from March 24, 2009, through the date of the decision. Tr. 19.

## V. Parties' Arguments

### A.    Plaintiff's arguments

First, Whitney argues that the ALJ failed to provide "good reasons" for disregarding treating physician Dr. Mills' December 20, 2011, opinion that Whitney would be absent from work for more than 4 days per month because of her impairments and treatment. Doc. 16, p. 7.

---

[25] The ALJ's findings are summarized.

[26] The ALJ also indicated that Whitney's "broken 'little' finger on her left hand" was not a severe impairment. Tr. 12-13.

Second, Whitney argues that the ALJ's Step Four finding that Whitney had the RFC to perform her past relevant work is contrary to law because the ALJ failed to follow the framework for evaluating a claimant's ability to perform her past relevant work as set forth in Social Security Ruling 82-62.[27]  Doc. 16, p. 8.

## B.    Defendant's arguments

In response to Whitney's first argument, the Commissioner argues that the ALJ thoroughly summarized Whitney's treatment notes during the relevant period and the ALJ's decision to provide no weight to Dr. Mills' opinion because it "departs substantially from the rest of the evidence of record" is supported by substantial evidence.  Doc. 17, pp. 10-14.

In response to Whitney's second argument, the Commissioner argues that, during the hearing, Whitney testified regarding her past relevant work, the ALJ obtained vocational expert testimony regarding Whitney's past relevant work, and the ALJ compared Whitney's RFC to the demands of her past relevant work.  Thus, the Commissioner contends that the ALJ did not err at Step Four.  Doc. 17, p. 15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

---

[27] Social Security Ruling 82-62 states the policy and explains the procedures for determining a claimant's capacity to perform past relevant work.  SSR 82-62, 1982 WL 31386 (1982).

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.      **The ALJ properly considered and explained the weight provided to the opinion of Plaintiff's treating physician Dr. Shelly K. Mills, D.O.**

Whitney challenges the ALJ's application of the treating physician rule to the December 20, 2011, opinion of her treating physician Dr. Shelly K. Mills, D.O. Doc. 16, pp. 6-8. More particularly, she argues that the ALJ failed to give "good reasons" for disregarding Dr. Mills' opinion that Whitney would be absent more than 4 days per month due to her impairments and treatment. Doc. 16, p. 7 (referencing Tr. 2070).

Dr. Mills was a treating physician and, under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (internal quotations omitted). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the

weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(c). However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

With respect to Dr. Mills' opinion, the ALJ stated:

> The claimant's treating physician, Shelly K. Mills, M.D., completed an assessment of the claimant's abilities for work activity, in December 2011. The undersigned notes that the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality with [sic] should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. The undersigned does not give Dr. Mills' opinion any weight as it is substantially inconsistent with the remainder of the record. (Exhibit 23F).

Tr. 18.

Prior to explaining his decision to provide no weight to Dr. Mills' opinion, the ALJ discussed Whitney's medical treatment history and other medical opinions regarding her breathing issues, colitis, and mental health issues. Tr. 17. That evidence included a July 2011 letter from one of Whitney's specialists, Dr. Kheterpal, to Dr. Mills wherein Dr. Kheterpal advised that "her [Whitney's] symptoms in regard to her ulcerative colitis have significantly

improved," [o]verall she [Whitney] feels significantly better" and her colitis was in "clinical remission." Tr. 17 (referencing, among other exhibits, Exhibit 17F), Tr. 1862-1863 (Dr. Kheterpal's June 20, 2011, letter to Dr. Mills).

The ALJ also considered evidence relating to Whitney's breathing issues, including diagnostic testing and evidence from her pulmonologist, Dr. Jacob. Tr. 17. As noted by the ALJ, March 2011 diagnostic testing showed that Whitney's lungs were clear and that pulmonary vasculature were unremarkable. Tr. 16, 1950. There was no acute process. Tr. 16, 1950. Also, in April 2011, Dr. Jacob saw Whitney because of her history of chronic lung disease in the form of bronchiectasis. Tr. 1867-1868. Following his evaluation of Whitney, Dr. Jacob informed Dr. Mills of his assessment, stating, in part, that Whitney "had been treated for bronchiectasis for a long time in the form of antibiotics, aerosol treatments and postural drainage. Recently she had felt much better and her pulmonary condition has been stabilized. Her only chronic complaint is cough with expectoration of sputum sometimes in the morning . . . She also has asthma with occasional wheezing and shortness of breath that responds to Xopenex aerosol treatment." Tr. 1867.

With respect to Whitney's mental health impairments, the ALJ acknowledged that her family physician had prescribed Paxil; however, except for a short hospital stay in May 2011, Whitney had not been treated by a psychologist or psychiatrist for her mental health impairments. Tr. 17. Also, the ALJ considered consultative psychologist Dr. Shamberg's evaluation wherein he indicated that Whitney "did not display overt signs of anxiety such, as fidgeting, or trembling. She does not have any specific fears or phobias, she does not appear to be experiencing panic attacks, she does not appear to suffer OCD problems, she does not appear to be the victim of Post Traumatic Stress Disorder problems . . . [s]he is not afraid to leave her

home to go into public places." Tr. 17, 1785.   Also, although Dr. Shamberg diagnosed Whitney with dysthymic disorder, the ALJ noted that Dr. Shamberg did not feel that he was able to diagnose Whitney with an anxiety disorder.  Tr. 17, 1785.

As thoroughly discussed by the ALJ, the foregoing evidence demonstrates a lack of consistency between Dr. Mills' opinion of work preclusive limitations and the other evidence of record.  Although Dr. Mills in her December 2011 opinion indicated that "multiple specialty reports" provided support for her opinion[28] (Tr. 2066), she did not identify the specialists nor did she identify the reports she was referring to.  As shown above, reports from at least two of Whitney's specialists, Dr. Jacob and Dr. Kheterpal, do not support Dr. Mills' opinion that Whitney has work preclusive limitations such as missing 4 or more days of work per month.

Based on the foregoing, Whitney's argument that the ALJ should have accepted and provided controlling weight to Dr. Mills' December 2011 opinion that Whitney's impairments and treatment would cause her to miss 4 or more day of work each month and/or that the ALJ did not adequately explain the weight provided to Dr. Mills' opinion is without merit.  Although Whitney had been diagnosed with and received medical treatment over the years for a multitude of medical issues, including breathing issues and colitis, the ALJ thoroughly discussed the evidence and determined that Dr. Mills' December 2011 opinion, which contained work preclusive limitations, was substantially inconsistent with the record and therefore was not entitled to any weight.  Further, the ALJ's discussion of the evidence and explanation of the weight provided to Dr. Mills' December 2010 opinion makes sufficiently clear the weight given to the treating physician's opinion and the reasons for that weight, *Wilson*, 378 F.3d at 544, and

---

[28] She also indicated that Whitney's "wheezing/dyspnea" was a clinical finding/objective sign.  Tr. 2066.

those reasons are supported by substantial evidence.  Accordingly, the Court finds no error in the ALJ's treatment of Dr. Mills' opinion.

**B.       The ALJ did not err at Step Four**

The ALJ found that Whitney had the RFC to perform her past relevant ("PRW") work of call center person (DOT 249.362-026)[29] and billing collection clerk (DOT 214.382-014).  Tr. 19. At Step Four of the sequential evaluation process, if a claimant's RFC does not prevent her from performing the demands of her past relevant work, then the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  Therefore, at Step Four, the ALJ concluded that Whitney was not disabled.  Tr. 19.

SSR 82-62 provides that, when concluding that a claimant has the capacity to perform PRW, the ALJ's findings must contain: (1) a finding as to the claimant's RFC; (2) a finding as to the physical and mental demands of the past job; and (3) a finding that the claimant's RFC would permit her to return to her past job.  SSR 82-62, 1982 WL 31386, * 4 (1982).  Contrary to Whitney's contention, the ALJ adhered to SSR 82-62 when making his Step Four determination.

First, the ALJ made an RFC finding with respect to Whitney's RFC and he explained that finding through a thorough analysis of both the medical and non-medical evidence.  Tr. 16-19.

Second, during the administrative hearing, the VE provided testimony regarding exertional and skill levels and provided DOT codes for a customer call center person and billing collection clerk, indicating that both positions were SVP4, sedentary positions, sedentary as performed.[30]  Tr.  60.  Consistent with the VE's testimony, the ALJ found that both positions were SVP4, sedentary positions.  Tr. 19; *see* 20 C.F.R. 404.1560(b)(2) (permitting the use of the

---

[29] The Dictionary of Occupational Titles is published by the Department of Labor.  *See* 20 CFR § 404.1566(d)(1).

[30] Whitney also provided testimony regarding her past work as a call center person and billing collection clerk.  Tr. 56-58.

services of a vocational expert or other resources such as the DOT at Step Four); *see also* SSR 82-62, 1982 WL 31386, \*3 (indicating that an ALJ may use supplementary information from other sources such as the DOT regarding the requirements of work). Thus, the ALJ made findings with respect to the physical and mental demands of the work of a call center person and billing collection clerk. Tr. 19.

Finally, the ALJ found that, when comparing Whitney's RFC for light work with the physical and mental demands of the work of call center person and billing collection clerk,[31] Whitney would be able to perform that work as actually performed.[32] Tr. 19.

While Whitney disagrees with the ALJ's ultimate Step Four determination, the foregoing demonstrates that the ALJ made the requisite Step Four findings in accordance with SSR 82-62.[33] Further, Whitney has not demonstrated that those findings are not supported by substantial evidence. Accordingly, reversal and remand is not warranted.

---

[31] While Whitney testified that she only worked as a billing collection clerk for a short period of time (Tr. 57-58), she does not argue that the billing collection clerk position did not constitute PRW. Thus, any such argument is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Also, Whitney had other PRW in addition to the billing collection clerk position that the ALJ found Whitney could perform.

[32] In reaching his conclusion, the ALJ noted that the VE had testified that Whitney would be able to perform the functions of the two positions. Tr. 19. As indicated above, reliance upon VE testimony at Step Four is permissible. 20 C.F.R. § 404.1560(b)(2). Further, Whitney does not raise a specific objection to the ALJ's reliance upon the VE's testimony to support his Step Four determination and the record supports the ALJ's finding. *See* Tr. 16, 61, 63 (the VE indicated that the reason that the ALJ's first described hypothetical individual would be unable to perform Whitney's past work as a call center person or billing collection clerk was because of a manipulative limitation included in the hypothetical, which was not ultimately included in the RFC).

[33] Whitney's reliance upon *Dealmeida v. Bowen*, 699 F.Supp. 806 (N.D. Cal. 1988) to support her claim that remand is warranted for application of SSR 82-62 is unpersuasive. The decision is non-binding and is distinguishable. In *Dealmeida*, the court indicated that the ALJ's decision merely made an ultimate conclusion that the claimant was able to perform his past relevant work and information about the claimant's past relevant work could not be adequately obtained from the record. *Dealmeida*, 699 F.Supp. at 807. In contrast, here the ALJ obtained and relied, in part, upon vocational expert testimony regarding the demands of Whitney's past relevant work.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  August 4, 2014

Kathleen B. Burke
United States Magistrate Judge